# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1724V

|  |  |
|---|---|
| JENNA JOHNSTON, | Chief Special Master Corcoran |
| Petitioner, |  |
| v. | Filed: January 2, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Renee Ja Gentry, The Law Office of Renee J. Gentry, Washington, DC, for Petitioner.*

*Katherine Edwards, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDING OF FACT[1]

On October 4, 2023, Jenna Johnston filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a right shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on February 19, 2021. Pet., ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find it more likely than not that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination, and that her pain and reduced range of motion ("ROM") were limited to her right shoulder, as alleged.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Though the parties made a tentative effort to settle this claim, they were ultimately unsuccessful. ECF Nos. 17-26. Respondent filed his Rule 4(c) Report in June 2025, arguing that Petitioner had failed to meet the requirements of a Table SIRVA because the medical records did not support the conclusion that the onset of her pain occurred within 48 hours of vaccination. Respondent's Report at 7-8, ECF No. 27 (internal citations omitted). Respondent further argued that Petitioner's pain was not limited to her right shoulder, and that her symptoms included neurological complaints, including paresthesias, which are inconsistent with a SIRVA. *Id.* at 8-9. The factual issues of onset and localization of symptoms are thus now ripe for consideration.

## II.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). The Court has also said that medical records may be outweighed by testimony

that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## III.    Relevant Factual Evidence[3]

Petitioner received the subject flu vaccine in her right deltoid on February 19, 2021, at her local pharmacy. Ex. 2 at 3-4.

In her affidavit (authored in October 2023), Petitioner attests that her "shoulder area was sore immediately after the vaccination." Ex. 17 ¶ 5. She recalls that she felt the needle "in a way [she has] never felt a needle before for any type of vaccination[,]" as she "could feel it deeply inside of [her] arm." *Id*. Petitioner states that "[i]n the hours & days after the administration, [her] arm grew progressively more sore." *Id*. She describes pain and "a lot of burning around the rotator cuff & weakness." *Id*. She also notes that the "pain in [her] right shoulder increased to the point of regularly waking up in the middle of the night in tears" because her shoulder "was throbbing & felt as if it had a fever." *Id*. ¶ 6.

Approximately three days post-vaccination, on February 22, 2021, Petitioner contacted her primary care provider's ("PCP") office regarding the results of lab work that was performed one day prior to vaccination. Ex. 3 at 60. Petitioner did not complain of right shoulder symptoms during this encounter. *See id*.

---

[3] Only those facts relevant to onset and whether Petitioner's post-vaccination symptoms were limited to the vaccinated shoulder will be discussed herein, though other facts may be provided as necessary.

Just over two weeks post vaccination, on March 8, 2021, Petitioner had a telehealth visit with her PCP for right shoulder pain. Ex. 3 at 61. Specifically, she reported that she "got a flu shot 2/19/2021. She thinks the shot was administered too high. Her arm was painful for a few days. She now has decreased ROM, pain and wakes up at night due to the pain." *Id.* Petitioner also reported "neck pain, numbness and tingling into right hand," and right-hand weakness. *Id.* She noted that she had been "researching shoulder injuries post vaccination and thinks that she has sustained an injury." *Id.* A physical examination specific to the right shoulder was not performed. *See id.* at 63.

The next day (March 9, 2021), Petitioner had another telehealth visit with her PCP complaining of "right shoulder pain since receiving her flu shot on 2/19/21." Ex. 3 at 67. She thought that the vaccination was "administered abnormally high and was particularly painful." *Id.* Petitioner stated that "[t]he pain has worsened since and she also [has] weakness and occasional paresthesias . . . [that] radiate down to her pinky finger[,]" plus a burning sensation. *Id.* The assessment included right shoulder joint pain and an "unspecified injury of right shoulder and upper arm." *Id.* at 68.

Petitioner had an initial physical therapy ("PT") evaluation on March 12, 2021. Ex. 3 at 81. She reported "Feb [sic] 19th – flu shot on R shoulder which seemed to be higher than usual . . . and had pain, warmth and redness for 4-5 days. Started to reduce and then had a significant increase around the beginning of last week. Not sure what caused the aggravation." *Id.* Petitioner also noted that she had "some radiating pain down to her pinky side of her forearm" that "only lasted a few days." *Id.* And, she had "[s]ome pain of R neck and levator/[upper trapezius] area but that resolved after the shoulder pain first started to reduce." *Id.* A physical examination of the right shoulder showed tenderness of the right supraspinatus, infraspinatus, and teres minor insertions. *Id.* at 82. The treater's assessment was right rotator cuff tendinitis "and/or bursitis following flu shot." *Id.*[4]

On March 29, 2021, Petitioner sought care with an orthopedist with a chief complaint of "right shoulder pain." Ex. 7 at 103. She complained of "[new pain] right shoulder, flu shot last month injected to [sic] high into arm[,] limited ROM, painful to move certain ways[,] pain increase with cold weather." *Id.* Specifically, she noted that she "got a flu shot in her right shoulder back on February 19. Shortly thereafter, she started having pain, decreased strength and limited [ROM] in the right shoulder." *Id.* Petitioner also got "occasional numbness in her right hand especially around the fifth digit but today she is not currently having the numbness." *Id.* Following a physical examination of the right shoulder (showing diminished ROM and strength), the orthopedist diagnosed Petitioner

---

[4] Petitioner did not return for additional PT treatment thereafter – a factor which will ultimately be relevant to damages (since it corroborates the conclusion that her SIRVA was mild).

with right shoulder pain, decreased ROM and strength, and noted she "[h]ad flu shot 6 weeks ago." *Id.* at 105-06.

The clinical history taken during Petitioner's April 14, 2021 MRI of the right shoulder included "[d]eltoid pain after flu shot. Weakness and decreased [ROM]." Ex. 7 at 94. During Petitioner's April 22, 2021 orthopedic follow-up visit to review the MRI results (consistent with subdeltoid bursitis and a rotator cuff tear in the infraspinatus tendon), the orthopedist noted that Petitioner "has had pain, limitation of motion and loss of strength since her injection in that arm a few months ago." *Id.* at 68. An examination of the right shoulder revealed decreased ROM and strength. *Id.* at 71. The orthopedist's assessment reiterated that Petitioner "has had these issues since her injection[;]" Petitioner received a steroid injection in the right shoulder. *Id.*

Petitioner underwent a repeat MRI of the right shoulder on April 30, 2021. Ex. 7 at 38. The clinical history was listed as "shoulder pain and limited [ROM] due to pain and weakness following flu vaccine 02/19/2021." *Id.* The MRI findings included mild distal infraspinatus tendinosis and that the tear seen on the first MRI had resolved. *Id.* at 39.

During an orthopedic follow-up visit on October 5, 2022, the orthopedist noted that Petitioner "has had problems with the right shoulder since she had a COVID [sic] injection that had caused limited [ROM] and pain in the right shoulder." Ex. 7 at 4. Petitioner reported pain in the "anterior and lateral aspect of her shoulder." *Id.* Petitioner was interested in further treatment options as her symptoms had "improved" but they still "wax and wane." *Id.* She received a repeat steroid injection in the right shoulder on December 6, 2022. *Id.* at 6. No other medical records or affidavit evidence has been submitted regarding the onset or localization of Petitioner's symptoms.

## IV.    Findings of Fact

### A.  Onset of Petitioner's Injury Occurred within 48 Hours of her Vaccination

A petitioner alleging a SIRVA claim must show that she experienced shoulder pain within 48 hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B) & 100.3(c)(10)(ii) (QAI criteria)).

Respondent contends the evidence does not support Table onset. *See* Respondent's Report at 7-8. But the totality of the evidence does weigh in Petitioner's favor on this issue. The aforementioned medical records, coupled with Petitioner's affidavit, establish that Petitioner consistently reported to treaters an onset close-in-time

to vaccination, that she sought treatment for shoulder pain within *17 days* of the February 19, 2021 vaccination, and that she was experiencing symptoms in the relevant timeframe.

The fact that Petitioner sought treatment within less than a month of her vaccination (on March 8, 2021,) is itself somewhat supportive of Table onset (absent an affirmative statement of onset outside the two-day period defined by the Table). In other cases, *significantly greater* delays have not undermined an otherwise-preponderantly-established onset showing consistent with the Table. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury). But the delay here is not nearly so long.

Likewise, the fact that Petitioner had one call to her PCP between the date of her vaccination and the March 8, 2021 visit – without mentioning right shoulder complaints – does not fully detract from her arguments on onset. Notably, while this February 22nd call was to her PCP – a treater to whom it would have been somewhat reasonable to mention musculoskeletal complaints – this purpose of this encounter was to follow up regarding unrelated lab work. Ex. 3 at 60. Thus, I do not find that the absence of shoulder references in the records from that call to prevent a showing of Table-consistent onset. This is especially true in light of the fact that Petitioner sought care for shoulder-related complaints fairly soon thereafter.

In addition, and most importantly, the filed medical record establishes that Petitioner consistently and repeatedly dated her shoulder pain as occurring close-in-time to the subject vaccination – beginning with the March 8, 2021 telehealth PCP visit, when she reported she "got a flu shot 2/19/2021 . . . . Her arm was painful for a few days. She now has decreased ROM, pain and wakes up at night due to the pain." Ex. 3 at 61. She also noted that she thought the "shot was administered too high." *Id.* Indeed, this report of pain linked to Petitioner's receipt of the subject flu vaccination was made just over *two weeks* post vaccination and is the earliest contemporaneous record of shoulder pain in this case. This entry thus supports 48-hour onset.

Other subsequent medical records describe onset consistently as beginning on February 19, 2021 (or soon thereafter), along with her repeated belief that the vaccination was given in the wrong place. *See,* e.g., Ex. 3 at 67 (a March 9, 2021 PCP visit reporting "right shoulder pain since receiving her flu shot on 2/19/21" and that she thought that the

6

vaccination was "administered abnormally high."); Ex. 7 at 103 (a March 29, 2021 orthopedic visit reporting she "got a flu shot in her right shoulder back on February 19. Shortly thereafter, she started having pain, decreased strength and limited [ROM] in the right shoulder."); *id.* at 38 (an April 30, 2021 history taken during an MRI, noting "shoulder pain and limited [ROM] due to pain and weakness following flu vaccine 02/19/2021."). More so, such entries corroborate the consistent contentions made in Petitioner's affidavit that her pain began within 48 hours of vaccination. *See* Ex. 17 ¶ 5.

While Respondent argues that one entry (from March 12, 2021,) appears to show Petitioner experienced typical post-vaccination pain that resolved after a few days and returned thereafter, this argument is not dispositive when considered in light of the entire record. In fact, this record entry, when read in full, provides supplemental support for Table-consistent onset. Indeed, Petitioner reported she received a flu shot on "Feb [sic] 19th . . . which seemed to be higher than usual" – which is congruous with her earlier reports discussed above. Ex. 3 at 81. Then, although she described pain, warmth, and redness "for 4-5 days" post vaccination, she did not say the pain resolved, subsided or dissipated after that time. *See id.* Rather, the pain "*[s]tarted to reduce* and then [she] had a significant increase around the beginning of last week." *Id.* (emphasis added). Thus, contrary to Respondent's argument, Petitioner's March 12th report provides some support for a showing of an onset that was close-in-time to vaccination and ongoing. (And a SIRVA claim is not otherwise defeated by evidence that the pain was not consistent – so long as it is shown to have *begun* in the Table timeframe, and to have existed long enough to meet the Table's severity requirement).

Some of Petitioner's records suggest an onset beginning at some unspecified time in February 2021, or generally after vaccination, but I do not find this evidence tips against a favorable onset determination. *See,* e.g., Ex. 7 at 94 (an April 14, 2021 history of "[d]eltoid pain after flu shot."); *id.* at 68 (an April 22, 2021 orthopedic note of "pain, limitation of motion and loss of strength since her injection in that arm a few months ago."). In fact, Petitioner still related her pain as beginning after her receipt of the vaccine in question. These records are thus fairly consistent with her other specific reports of pain beginning after her subject vaccination discussed above and provide further support for 48-hour onset.

### B. Petitioner's Pain was Limited to her Right Shoulder

The third QAI requirement for a Table SIRVA requires a petitioner's pain and reduced ROM to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii).

While Respondent contest's Petitioner's satisfaction of this element, I find the evidence likewise favors Petitioner on this issue. Respondent's Report at 8-9. First, Petitioner's records consistently report or describe right shoulder pain and loss of ROM and strength, which are symptoms consistent with other SIRVA cases. Petitioner's diagnostic procedures were also limited to her right shoulder, she was diagnosed with conditions specific to the right shoulder, and she received specific treatment for right shoulder pain – as opposed to treatment pertaining to her other extraneous complaints.

Second, although there are record references to pain radiating down Petitioner's right arm to her fifth digit or in her neck, the majority of other records support a finding that Petitioner's pain and reduced ROM was limited to her right shoulder, and more so, *originated* from the shoulder. In fact, complaints of non-shoulder pain appear to be occasional and otherwise incidental to her primary reports of right shoulder pain. *See,* e.g., Ex. 3 at 61 (a March 8, 2021 PCP report that she had right shoulder pain that woke her up at night, along with "neck pain, numbness and tingling into right hand" and right hand weakness); *id.* at 67-68 (a March 9, 2021 PCP report of shoulder pain plus "weakness and *occasional* paresthesias . . . [that] radiate down to her pinky finger" and a burning sensation, but an assessment of right shoulder joint pain and an "unspecified injury of right shoulder and upper arm."); *id.* at 81-82 (a March 12, 2021 PT report of shoulder pain, "some radiating pain down to her pinky side of her forearm," and "[s]ome pain of R neck and levator/[upper trapezius] area . . . that resolved after the shoulder pain first started to reduce[;]" the assessment included right rotator cuff tendinitis "and/or bursitis following flu shot."); Ex. 7 at 103-06 (a March 29, 2021 orthopedic report of shoulder pain and "*occasional* numbness in her right hand especially around the fifth digit" but diagnoses of right shoulder pain and decreased ROM and strength).

In the Program, special masters have found that SIRVA claims involving musculoskeletal pain *primarily* occurring in the shoulder are valid under the Table, even if there are additional allegations of pain extending to adjacent parts of the body. *K.P. v. Sec'y of Health & Hum. Servs.*, No. 19-65V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022) (holding that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body").

The mere fact that a claimant has raised complaints of pain elsewhere physically does not automatically disqualify the claim as a SIRVA. Indeed, the gravamen of the third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Hum. Servs.,* No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022); *Werning v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed.

Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder"); *Cross v. Sec'y of Health & Hum. Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding that "despite the notations of pain extending beyond the shoulder, the petitioner's injury is consistent with the definition of SIRVA and there is not preponderant evidence of another etiology"). Resolution of this QAI, like all elements of a Table claim, involves a preponderant balancing of proof – and if that balancing suggests *primarily* shoulder concerns, that is enough.

Here, Petitioner in some isolated circumstances reported instances of pain and/or weakness/numbness extending beyond the shoulder, but her injury and diagnoses (specific to shoulder joint pathology) were otherwise consistent with a SIRVA. *See Durham v. Sec'y of Health & Hum. Servs.,* No. 17-1899V, 2023 WL 3196229, at *11-13 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (finding "this is not a case where the medical records reflect that the symptoms beyond the confines of the shoulder are incidental to what was otherwise clearly treated as a shoulder injury," as the petitioner showed prominent symptoms of radiculopathy/numbness into the hand and neck, there ultimately was not any confirmed final diagnosis of a shoulder joint pathology, and a cervical etiology was deemed more likely by physicians). The evidence supporting SIRVA-related symptoms of shoulder pain and limited ROM here outweighs the incidental complaints of numbness/weakness into the hand that ultimately did not receive a separate diagnosis. Petitioner has therefore established this QAI criterion.

**Conclusion and Scheduling Order**

I encourage the parties to promptly re-attempt an informal resolution of this claim before expending any further litigative resources on the case. If at any time informal resolution (of either settlement or proffer) appears unlikely, given that the claim has been pending in SPU for over one year (having been assigned in January 2024), the parties should propose a method for moving forward, i.e., with a proposed briefing schedule or otherwise stating how they wish to proceed.

Accordingly, **by no later than Monday, February 2, 2026**, the parties shall file a joint status report confirming the date on which Petitioner conveyed, or intends to convey, a reasonable revised settlement demand[5] for Respondent's consideration. **If applicable,**

---

[5] Indeed, consistent with the discussion herein depicting fairly limited and conservative treatment, only, Petitioner should not expect to receive more than a *modest* award for pain and suffering – even at full value of this case. The parties' attempt at informal resolution should proceed with that parameter in mind.

**the status report may also state whether Respondent wishes to file an amended Rule 4(c) report and stating how much time is needed to submit said report.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master